# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSEFINA CHIHUAHUA,** | ) | |
| **Plaintiff,** | ) | **No. 13 C 8248** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Josefina Chihuahua brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (Compl.) [Dkt 1.] Plaintiff filed a motion for summary judgment [dkt 14] and a supporting memorandum seeking an order reversing the Commissioner's final decision and entering a finding of disability and an award of benefits, or an order remanding for further administrative proceedings (Pl.'s Mem. [dkt 15]).

The Commissioner also moved for summary judgment [dkt 19] and submitted a memorandum in support of that motion (Def.'s Mem. [dkt 20]). Plaintiff replied. (Pl.'s Reply.) [Dkt 21.] The parties consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 7.] For the reasons set forth below, Plaintiff's motion is granted and the Commissioner's motion is denied.

**PROCEDURAL HISTORY**

Plaintiff first applied for benefits on August 13, 2010 alleging a disability onset date of April 14, 2009. (R. 114-22.) Her claim was denied initially on November 4, 2010, and again upon reconsideration on April 12, 2011. (R. 43-44.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on May 30, 2012. (R. 23-42.) The ALJ issued a decision denying Plaintiff's request for benefits on June 27, 2012. (R. 8-22.) The Appeals Council declined Plaintiff's request for review on September 19, 2013, thereby making the ALJ's decision the final decision of the Commissioner. (R. 1-4.) *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

**BACKGROUND**

Plaintiff was 53 years old at the time of the hearing before the ALJ. (R. 112-13.) She is a permanent legal resident who attended high school in Mexico. (R. 112, 162, 166.)[1] She lives with her husband, Ramon Chihuahua, and two children. (R. 117.) Plaintiff received worker's compensation benefits in 2009 and 2010. (R. 129-30.)[2]

---

[1] A disability field report, on Form SSA-3368, states that the highest level of school Plaintiff completed was the ninth grade. (R. 162.) The report, however, also states that Plaintiff "completed high school in Mexico." (R. 166.) At the hearing before the ALJ, Plaintiff testified that she had completed the ninth grade. (R. 28.)

[2] The nature of Plaintiff's on-the-job injury and its relation to her claim for disability are unclear. The record contains a letter from Dr. Bruce Montella, a treating physician, stating that Plaintiff was under his care for an injury she sustained on January 28, 2008 while at work. (R. 371.) Dr. Montella also states that Plaintiff had "a work related cervical disc herniation with radiculitis." (*Id*.) Additional treatment notes from Dr. Montella state that the date of injury is unknown and that "in [the] patient's own words: 'The injury started just little by little'" and was reported to the employer on January 28, 2008I. (R. 373.) A September 7, 2010 client profile states that on January 28, 2008, Plaintiff reported that her hands went numb and her fingers became swollen after she

From 1994 through 2000, Plaintiff worked as a metal tester.  (R. 181.)  In this position, she carried parts weighing up to 50 pounds to and from a testing machine.  (R. 182.)  From 2000 to 2001, Plaintiff lifted sinks for use in store displays onto a machine that stamped ordering information onto the sinks, then packed the sinks in boxes and stacked them.  (R. 181, 183.)  From August 2001 to April 2009, Plaintiff worked for Menard Midwest and built wooden trusses used to support roofs on houses. (R. 28-30, 181.)  In this position, Plaintiff used her hands to operate tools, such as a hammer and wrench, and moved up to 100 pounds occasionally and up to 60 pounds frequently.  (R. 184.)

Plaintiff stopped working on April 14, 2009, when she asserts that she became disabled due to physical impairments.  (R. 29.)  She returned to her position at Menard Midwest in December of 2011, but testified before the ALJ that she was only able to work for two weeks due to hand pain. (*Id*.)

### Medical Evidence

Plaintiff asserts that she has carpal tunnel syndrome that persists despite surgical releases on both hands, and wrists that are tender when palpated.  (R. 337- 40, 539.)  She also points to diagnoses of esophageal reflux, obesity, stress incontinence, hypertension, shoulder impingement syndrome, and cervical herniation with radiculitis.  (Pl.'s Mem. at 3 (citing R. 225-26, 538-40, 571, 579-81).)[3]

---

moved "many items" at work.  (R. 442.)

[3] Shoulder impingement syndrome is "a type of overuse injury with progressive pathologic changes resulting from mechanical impingement by the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff; changes may include reversible edema and hemorrhage, fibrosis, tendinitis, pain, bone spur formation, and tendon rupture."  *Dorland's Illustrated Medical Dictionary* 1834 (32nd ed. Elsevier Saunders 2012) [herinafter *Dorland's*].

Plaintiff states that she has taken or is taking the following medications: "Hyzwar" (a high blood pressure medication), "Gabatentin" (a medication used by Plaintiff to treat "nerve pain"), Tramadol (a pain medication), Zofran (an anti-nausea medication), Zolpidem (a medication used to treat sleeplessness), "Hydroco/APHP" and Ultram (medications used to treat pain), Mobic (an anti-inflammatory medication used to treat pain and inflammation), and Prilosec (a medication used to treat heartburn). (Pl.'s Mem. at 3 (citing R. 164, 223, 259).)[4]

**Plaintiff's Description of Her Limitations and the Testimony Before the ALJ**

Plaintiff testified that she suffers from pain in her right shoulder, neck, and wrists, as well as in her back when she moves. (Pl.'s Mem. at 3.) She says that she can make sandwiches, fried eggs, and frozen dinners daily, with pain, and that she can do laundry once a week for one hour if

---

A herniation is "the abnormal protrusion of an organ or other body structure through a defect or natural opening in a covering, membrane, muscle, or bone." *Id.* at 852.

Radiculitis is an "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." *Id*. at 1571.

[4] "Hyzwar" is presumed to be Hyzaar. *See* Hyzaar Prescribing Information, http://www.merck.com/product/usa/pi_circulars/h/hyzaar/hyzaar_pi.pdf (last visited May 17, 2016).

"Gabatentin" is presumed to be Gabapentin, which is also sold under the brand name Neurontin. *See* Neurontin Prescribing Information, http://labeling.pfizer.com/ShowLabeling.aspx?id=630 (last visited May 17, 2016).

Zolpidem is also sold under the brand name Ambien. *See* Ambien Prescribing Information, http://products.sanofi.us/ambien/ambien.pdf (last visited May 17, 2016). Plaintiff includes both Zolpidem and Ambien in her list of medications. (Pl.'s Mem. at 3 (citing R. 209, 570).)

The correct abbreviation is Hydroco/APAP, which is a shortened version of Hydrocodone-Acetaminophen. This medication is sold under the brand name Vicodin. *See* http://www.vicodin.com/ (last visited May 17, 2016).

she loads and unloads the machine one item at a time and receives help.  (R. 216, 218.)  Plaintiff is able to watch television, read, and go to church.  (R. 220.)  Knee pain negatively impacts her ability to walk, squat, bend, and stand for long periods.  (R. 221.)

During the hearing before the ALJ, Plaintiff testified that her treating physician, Dr. Bruce Montella, told her to stop working.  (R. 30.)  She also testified that her "hands do not have any strength" and the little finger of her left hand is permanently bent.  (R. 30-31.)  Plaintiff testified that she experiences a "very strong pain" in her right shoulder, elbow, and arm.  (R. 31.)  Plaintiff also tore the meniscus in her left knee and treated it with physical therapy rather than surgery.  (R. 34.)  She is able to walk around a grocery store with her husband for fifteen to twenty minutes but does not lift items from the shelves.  (R. 32.)  Plaintiff testified that she cannot lift a four to five pound object with her right hand, but is able to lift it with her left hand.  (R. 33.)  She has trouble manipulating buttons and zippers, holding a coffee cup, opening a soda bottle, and bathing without assistance.  (R. 33-34, 194, 216.)

Plaintiff's husband testified that over the last four to five years, Plaintiff developed difficulty carrying items.  (R. 35.)  He believes that during this time, she suffered from worsening pain in her hands and arms that only marginally improved with carpal tunnel surgery.  (R. 35-36.)  He also testified that Plaintiff cannot do household chores such as laundry or open a can of food, and that pain and numbness prevent her from using a computer.  (R. 37-38.)  He further testified that Plaintiff did not have surgery on her knee or continue with therapy due to finances.  (R. 38-39.)

**Treating Physicians**

Records indicate that Plaintiff was treated by several doctors, most consistently by Dr. Bruce Montella and Dr. Majad Ali, from mid-2009 through mid-2012.  (R. 258, 272-83, 286-302, 331-40, 371-433, 462-89, 497-502, 512-14, 538-69, 578-79, 584-86.)  In May 2009, Plaintiff was referred to a neurologist by Dr. Antoine Chami.  (R. 504.)  The neurologist opined that Plaintiff likely had peripheral neuropathy including bilateral carpal tunnel and cubital tunnel syndrome.  (*Id.*)[5]  In June 2009, Plaintiff began seeing Dr. Bruce Montella who diagnosed her with bilateral shoulder impingement syndrome and bilateral carpal tunnel in her wrists and recommended that she consider carpal tunnel release surgery.  (R. 373-75.)  A month later, in July 2009, Dr. Montella performed carpal tunnel release surgery on Plaintiff's right hand.  (R. 337-38.)  In September 2009, Dr. Montella performed the same surgery on Plaintiff's left hand.  (R. 339-40.)  Dr. Montella continued to see Plaintiff approximately every six weeks from September 2009 through May 2012.  (R. 376-413, 538-69.)  After the initial post-surgical follow-up appointments, Dr. Montella's observations and recommendations remained consistent.  (R. 378-413, 538-69.)  His notes indicate that Plaintiff has tenderness and range of motion limitations in her right shoulder, and  he recommends hand therapy, physical therapy, and splint use.  (*Id.*)  As early as November 2009, as well as in 2010, 2011, and 2012, Dr. Montella periodically recommended an "operative intervention in the form of a [r]ight

_____

[5] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system."  *Dorland's* at 1268.

Carpal tunnel syndrome is an "entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow."  *Id.* at 1824.

Cubital tunnel syndrome is a "type of entrapment neuropathy with a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, including pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand."  *Id.* at 1826-27.

shoulder [a]rthroscopy and subacromial decompression with possible rotator cuff repair" or opined that Plaintiff may require surgery at some point. (R. 379, 405, 410, 540, 543, 546, 549, 552, 555, 559, 562, 565, 569.) In September 2011, Plaintiff received a cortisone injection in her right shoulder, presumably to deal with pain. (R. 556.)

On December 28, 2010, Dr. Montella wrote a letter "to whom it may concern." (R. 225-26.) He opined that Plaintiff was "permanently, totally disabled" due to the problems with her hands, arms, right shoulder, and back. He based this opinion on his finding that she had right shoulder impingement, carpal tunnel syndrome and strength impingement in both hands, and a cervical disk herniation. (R. 225.) He opined that Plaintiff's problems worsened with activity to the extent that they required increased pain medication that could harm Plaintiff or endanger others in the work environment. (R. 226.) Dr. Montella first "supported" Plaintiff's "permanent and total disability" in May 2010 and continued to reiterate that point in his notes on most of Plaintiff's subsequent visits through May 2012. (R. 392, 396, 399, 402, 405, 410, 469, 540, 543, 546, 549, 552, 555, 559, 562.) His notes from 2009 through the last records consistently say "no work." (*See, e.g.*, R. 376 (2009), R. 559 (May 2012).)

Records indicate that Plaintiff was first treated by Dr. Ali in April 2010 for reasons related to complications from blood pressure medication. (R. 300.) At a visit in May 2010, Dr. Ali noted, among other things, that Plaintiff was struggling with knee pain, chest pain, hypertension, obesity, insomnia, and overactive bladder. (R. 272.) Dr. Ali made several referrals which resulted in follow-up appointments for Plaintiff in June 2010. (R. 282-83, 286-89.) At those follow-up appointments, Plaintiff was diagnosed with a torn meniscus in her left knee and stress-related urinary incontinence. (R. 287, 289.) Plaintiff elected to treat her torn meniscus with physical therapy. (R. 287.)

Treatment notes from July 2011 indicate that Plaintiff was struggling with back pain, morbid obesity, and hypertension. (R. 581.)

### Functional Capacity Evaluations

Dr. Montella referred Plaintiff to Mark Tenhor, an occupational therapist, for a functional capacity evaluation in September 2010. (R. 341-70.) The purpose of the evaluation was to determine whether: (1) Plaintiff "provide[d] full physical effort during testing;" (2) Plaintiff's "subjective reports [were] reliable;" (3) Plaintiff was "capable of performing her pre-job injury;" and (4) if not, what her physical abilities are. (R. 341.) Tenhor performed a battery of tests to evaluate Plaintiff's hands and wrists, dexterity, pinch and grip strength, her entire body's range of motion, agility, stamina, cardiovascular fitness, and ability to crouch, squat, kneel, and lift. (R. 353-61.) Tenhor noted that Plaintiff self-terminated the carrying, lifting, and pushing/pulling tests based on assertions of pain even though he did not observe signs of "physical discomfort, compensatory postures or altered body mechanics suggesting difficulty." (R. 341.)

Tenhor also stated that two tests he administered reflected Plaintiff's perception that she could perform "less than sedentary work" but he believed that she had "demonstrated the ability to perform at a higher physical demand level during the testing day." (R. 342.) Tenhor also administered "physical effort" testing to determine if the data from the other tests represented Plaintiff's physical maximum ability. (R. 362-65.) He saw "markedly few" signs of competitive test performance throughout the day. (R. 364) Tenhor also stated that Plaintiff's heart rate during testing did not near or exceed her aerobic target rate which suggested questionable effort. (*Id*.) Finally, Tenhor administered tests to evaluate Plaintiff's subjective reports of pain and disability. (R. 366-

69.) Tenhor concluded that his clinical testing and observations suggested that "considerable question[s]" could be drawn about Plaintiff's subjective reports of pain and limitations. (R. 368.) He thus recommended that more weight be placed on objective tests versus Plaintiff's subjective opinions about her condition. (R. 459.)

Tenhor ultimately concluded that Plaintiff had exerted "sub-maximal effort" during testing and could "do more physically at times than was demonstrated during [the] testing." (R. 341.) According to Tenhor, Plaintiff could perform "Sedentary-Light" level work with restrictions. (R. 342.) She could: (a) lift up to 20 pounds from the floor to waist level occasionally; (b) lift up 15 pounds from waist to shoulder level occasionally; (c) lift up to 10 pounds from waist to overhead level occasionally; (d) carry up to 20 pounds bilaterally for up to 30 feet occasionally; and (e) push and pull up to 10 pounds occasionally. (R. 342-43.) He also recommended that she "minimize tasks requiring pinching, light grasp, firm grasp, reaching forward, and overhead reaching." (R. 343.)

In October 2010, Dr. Muhammad Rafiq evaluated Plaintiff at the request of the Bureau of Disability Determination Services. (R. 303-06.) He spent approximately 26 minutes reviewing information, interviewing, and examining Plaintiff. (R. 303.) Dr. Rafiq found that Plaintiff's range of motion in her shoulders, elbows, wrists, hips, knees, and ankles was normal, but that she had mild difficulty picking up a coin or flipping the pages of a magazine with her left hand. (R. 305.) Dr. Rafiq's impression was that Plaintiff had right shoulder pain and carpal tunnel syndrome in both hands. (R. 306.)

Dr. Reynaldo Gotanco prepared a physical residual functional capacity assessment dated October 22, 2010. (R. 308-15.) He stated that Plaintiff's primary diagnosis was bilateral carpal tunnel syndrome and that she had full range of motion in all other joints, including her shoulders,

but a limited ability to perform gross and fine manipulations with her hands. (R. 308-09, 311.) Dr. Gotanco indicated that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally climb ladders. (R. 309-10.) Dr. Gotanco found that Plaintiff has postural limitations: "Weakness in the hands. She can occasionally climb ladders. She cannot climb ropes and scaffoldings due to pain and weakness of the hands." (R. 310.) He also found that Plaintiff has manipulative limitations on handling and fingering. (R. 311.) He then noted that "Dr. Montella states (6/6/10) that 'patient is permanently and totally disabled.' This statement is reserved to the commissioner, therefore cannot be assigned any weight." (R. 314.)[6]

On October 26, 2010, Dr. Phyllis Brister prepared a psychiatric review of Plaintiff. (R. 316-29.) The notes at the end of that report state that Plaintiff's reported difficulties with walking, standing, bending, and lifting were viewed as "partially credible," and while her medically determinable impairments could be expected to limit her ability to function, "the limitations described by [the Plaintiff] exceeds that supported by the objective [medical evidence of record.]" (R. 328.) The notes then repeat the statement that Dr. Montella's belief that Plaintiff was permanently and totally disabled was not entitled to any weight because that issue is reserved to the commissioner. (*Id.*)

---

[6] The court assumes that the reference to a "6/6/10" finding of disability is a typographical error and that Dr. Gotanco intended to refer to Dr. Montella's May 6, 2010 treatment notes. (R. 387.)

## THE DISABILITY DETERMINATION PROCESS

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is able to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. If that burden is met, at step five, the burden shifts to the Commissioner to establish that the

there is work existing in significant numbers in the national economy that Plaintiff can perform in spite of her limitations. *Id.*

## THE ALJ'S DECISION

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since April 14, 2009. (R. 13.) At step two, the ALJ concluded that Plaintiff had the severe impairments of carpal tunnel syndrome and disorders of muscle, ligament, and fascia. (*Id.*) At step three, the ALJ found that Plaintiff's impairments did not meet a disability listing. (R. 13-14.) In reaching this conclusion, the ALJ considered Listing 1.02, which governs evaluation of the ability to ambulate and to perform fine and gross movements with the upper extremities, and Listing 1.04, which relates to disorders of the spine. (*Id.*) The ALJ concluded that Plaintiff could ambulate and "use her upper extremities to perform fine and gross movements effectively." (R. 14.) He also "considered the carpal tunnel under the neurological listing, but . . . found no listing met/equals." (*Id.*)

The ALJ next determined that Plaintiff has the residual functional capacity to perform the full range of light work. (*Id.*) In reaching that conclusion, the ALJ considered Plaintiff's physical impairments and found that they could reasonably be expected to produce her pain and other symptoms. (R. 14-15.) He also noted that Plaintiff was closely approaching advanced age and had a limited education with past relevant work as an assembler and in quality control. (R. 14.) He then characterized Plaintiff as stating that she had "strong elbow pain when cooking dinner" and "could only walk for 20 minutes at a time" and "only lift four pounds at a time with both arms," but

12

nevertheless could "fix her own meals, do laundry, drive, go shopping independently, and manage her finances." (R. 15 (citing R. 216-24).)

Further, the ALJ stated that he did not credit Plaintiff's testimony about her limitations because it was inconsistent with the medical evidence and District Office personnel who met with the Plaintiff and did not observe any limiting factors. (R. 15.) The ALJ also stated that Plaintiff's credibility was further undermined because she misrepresented her English language ability by stating that she could not speak English at her hearing even though she said she could speak, read, and understand English and could write more than her name in English when she filled out Form 3368 (Disability Report - Adult). (*Id*.)[7] The ALJ acknowledged that Plaintiff had carpal tunnel problems and noted her surgeries in 2009. (*Id*.) However, he also noted occupational therapist Mark Tenhor's finding that Plaintiff did not exert maximum effort during functional capacity testing. (*Id*.)

The ALJ did not give controlling weight to Dr. Montella's opinion that Plaintiff was permanently and totally disabled because, he said, it was "apparent that Dr. Montella was referring to [Plaintiff's] worker's compensation claim in expressing his opinion." (R. 17.) The ALJ further discounted Dr. Montella's opinion due to his consideration of "other factors, such as: 1) the amount of understanding of the disability program and evidentiary requirements and 2) the extent to which Dr. Montella is familiar with other information in the case record, as stated in 20 C.F.R. § 404.1527(d)(6)." (*Id*.) The ALJ also stated that Dr. Montella's opinion was "inconsistent with the results of [Plaintiff's] functional evaluation, which reflected that [Plaintiff] was capable of doing sedentary to light level work, based on the physical capacities she demonstrated during testing." (*Id*.)

---

[7] A new Social Security Administration ruling, SSR 16-3p, eliminates the term credibility, as discussed in greater depth later in this opinion.

The ALJ gave "some weight" to medical consultant Dr. Reynaldo Gotanco's opinion that Plaintiff could perform light level work. (*Id*.) The ALJ disagreed, however, with Dr. Gotanco's postural and manipulative restrictions because, in the ALJ's opinion, the medical records post-dating Dr. Gotanco's examination show improvement following Plaintiff's carpal tunnel release surgeries. (*Id*.)

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a warehouse worker, as this is performed at the medium exertional level. (*Id*.) At step five, the ALJ found that "[t]ransferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not [Plaintiff] has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)." (R. 18.) Specifically, he explained that he applied Medical-Vocational Rule 202.11 to find that Plaintiff was not disabled given her age, education, work experience, and a residual functional capacity that allowed her to perform all or substantially all of the exertional demands of light work. (*Id*.) Thus, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. (*Id*.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## DISCUSSION

Plaintiff claims the ALJ erred in his determinations of Plaintiff's residual functional capacity (RFC) and credibility. First, Plaintiff argues that the record does not support the ALJ's finding that she has the residual functional capacity to perform a full range of light work because: (1) the ALJ failed to conduct a functional assessment of Plaintiff's work-related capacities and did not produce a narrative discussion connecting the Plaintiff's RFC to the medical record; (2) the ALJ failed to consider the combined effect of all of Plaintiff's conditions, including obesity, and instead erroneously considered each condition separately; (3) the ALJ placed too much weight on the occupational therapy report from Mark Tenhor and did not account for the fact that Dr. Montella,

the treating physician, asked Tenhor to evaluate Plaintiff and did not revisit his conclusion that Plaintiff was disabled after Tenhor opined that Plaintiff's test results understated her abilities; and (4) the ALJ did not consider all of Dr. Montella's opinions about Plaintiff's conditions. (Pl.'s Mem. at 6-8.)

The Commissioner opposes Plaintiff's arguments and asserts that substantial evidence supports the ALJ's determination that Plaintiff could perform a full range of light work. (Def.'s Mem. at 2-5.) In support the Commissioner argues that: (1) the ALJ identified Plaintiff's impairments and assessed the medical evidence showing their diagnosis, treatment, and testing to show her functionality; (2) Plaintiff speculates that her obesity intensifies her physical impairments; (3) Tenhor's opinion as an "other source" was validly considered; and (4) the ALJ appropriately denied controlling weight to Dr. Montella's opinion that Plaintiff was permanently totally disabled because that decision is reserved to the Commissioner. (*Id*. at 2-8.) The Commissioner also argues that substantial evidence — medical evidence not supporting Plaintiff's claims about the extent of her limitations, Mr. Tenhor's finding that Plaintiff underperformed at her functional capacity assessment, District Office personnel observing no limiting factors in Plaintiff, and Plaintiff's inconsistent statements about her ability to communicate in English — supports the ALJ's credibility determination. (*Id.* at 8-11.)

Plaintiff is correct that the case must be remanded. The ALJ's decision that Plaintiff is not disabled was based solely on the Medical-Vocational Rules (the "grid") without any testimony by a vocational expert. As the Seventh Circuit explained, the use of the grid is proper only when the claimant's individual characteristics precisely fit the criteria of the grid:

> The regulations provide a "grid," which the ALJ is permitted to use if the applicant's exertional capacity, age, education, and past work experience fit the requirements of

a rule withing the grid. But the grid may be used only if the claimant's individual characteristics fit precisely within the criteria; in that subset of cases, it offers a convenient short-cut for the ALJ. Otherwise, however, more particularized evidence about the jobs that would be available for the applicant is necessary.

*Borski v. Barnhart*, 33 Fed. Appx. 220, 223-24 (7th Cir. 2002) (non-precedential decision citing

*Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999)).

In finding Plaintiff not disabled, the ALJ applied Medical-Vocational Rule 202.11. That was not the correct rule to apply. Plaintiff's past work is classified as unskilled. (R. 17.) Rule 202.11 should be applied when the claimant's past work experience is skilled or semi-skilled. 20 C.F.R. Part 404, Subpart P, Appendix 2. Rule 202.10 is applied when the claimant's past work experience is unskilled. (*Id.*)

If Plaintiff were properly classified as capable of the full range of light work, Rule 202.10 would also direct a finding of "not disabled." (*Id.*) However, the ALJ's finding that Plaintiff is capable of the full range of light work is not supported by substantial evidence. In order to reach that RFC, the ALJ disregarded significant evidence in the record.

First, the ALJ improperly disregarded Dr. Montella's findings about Plaintiff's impairments. The Commissioner is correct that the ALJ could properly disregard Dr. Montella's conclusion that Plaintiff was totally disabled. As the Seventh Circuit has recently stated:

> [T]he Social Security Administration defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity" of a claimant's impairments, including the claimant's symptoms, diagnosis, prognosis, physical and mental restrictions, and residual functional capacity. 20 C.F.R. § 404.1527(a)(2); *Gayheart v. Comm'r Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). Omitted from this definition are opinions about a claimant's ability to work, a question the regulation reserves for the Commissioner. See 20 C.F.R. § 404.1527(d)(1); *Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002). Thus, the ALJ did not have to accept Dr. Cusak's October 2012 conclusory statement that Loveless could not work. The ALJ needed

only to weigh Dr. Cusack's assessments about the nature and severity of Loveless's impairments, which he did.

*Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016).

Here, however, the ALJ not only disregarded Dr. Montella's conclusion of disability, he disregarded Dr. Montella's reports of Plaintiff's symptoms, diagnosis, prognosis, physical and mental restrictions, and residual functional capacity. Dr. Montella treated Plaintiff consistently over a three year period into 2012, well after Tenhor's and the consulting physicians' 2010 evaluations of her. Dr. Montella consistently maintained his assessment of Plaintiff's pain and limited range of motion in her right arm and shoulder. For example, as late as 2012, Dr. Montella opined that Plaintiff would need intermittent medication and may require surgery. (R. 559.)

An ALJ must give controlling weight to a treating physician's opinion if it is both (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011.) Treating physicians' opinions are usually given more weight than other sources because they "provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give controlling weight to a treating physician's opinion, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's speciality, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)(2)-(5).

Notwithstanding the three-year duration of Plaintiff's treatment by Dr. Montella , the ALJ's opinion gives no indication that the ALJ considered any of Dr. Montella's findings except to dismiss Dr. Montella's conclusion.  On remand, the ALJ should address the other factors listed in 20 C.F.R. § 404.1527(c) in evaluating Dr. Montella's medical opinions.  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

In applying the grid, the ALJ also disregarded specific findings of the medical consultant, Dr. Gotanco.  Although the ALJ gave "some weight" to Dr. Gotanco's finding that Plaintiff was capable of light work (R. 17), he failed to consider the manipulative limitations of handling, fingering, and climbing that Dr. Gotanco found. (R. 310-11.)  Those nonexertional limitations preclude the ALJ's relying solely on the grid.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e).  The ALJ, however, "disagree[d] with the postural and manipulative restrictions assessed by Dr. Gotanco" based on the ALJ's own interpretation of the medical records after Dr. Gotanco's assessment.  (R. 17.)  The ALJ was, indeed, "playing doctor" and making an independent medical finding about the Plaintiff's "symptomology following her carpel tunnel release surgeries" that is not supported by any of the medical opinions in the record.  (R. 17.)  "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).

The ALJ also selectively read the conclusions of the occupational therapist, Mark Tenhor, to whom Dr. Montella referred Plaintiff.  Tenhor concluded that Plaintiff's impairments qualified her for the "Sedentary-Light" level of work with additional limitations.  (R. 342-43.)

Additionally, there is no mention of Dr. Ali's treatment of Plaintiff in the ALJ's decision. It appears that ALJ disregarded Dr. Ali's diagnoses of back pain, morbid obesity, and hypertension.

The ALJ should have included these limitations, which are supported by the medical records, in his evaluation of Plaintiff's RFC.

With respect to Dr. Ali's report of Plaintiff's obesity, "an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (citing SSR 02-1p). Dr. Ali's treatment notes from May 2010 and July 2011 indicate that Plaintiff is obese and morbidly obese. (R. 272, 581.) In a letter to Dr. Ali in June 2010, Dr. Lacart notes that Plaintiff is 5'1" and 170 pounds. (R. 286.) Dr. Ali noted Plaintiff's weight as 183 pounds in 2010 and 185.6 pounds in 2011. (R. 277, 581.) The ALJ did not address Dr. Ali's treatment of Plaintiff and so could not have considered her obesity when determining her RFC. That is not harmless error. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). On remand, the ALJ must discuss Plaintiff's obesity and whether it affects her RFC, including her ability to stand and walk.

It was error for the ALJ to disregard the evidence that is contrary to his conclusion that Plaintiff is capable of the full range of light work and to simply apply the grid. The difference in the application of the grid is significant. For example, if the ALJ were to determine on remand that Plaintiff could perform work at the sedentary level rather than the light level and again rely on the grid to determine whether Plaintiff was disabled, Medical Vocational Rule 201.09 would result in a finding of disabled. If Plaintiff's limitations do not fit squarely in any of the listings on the grid, the ALJ may decide to seek an opinion from a vocational expert. *See* 20 C.F.R. § 404.1566(e).

Plaintiff also questions the ALJ's conclusion about Plaintiff's credibility. (R. 15.) The Social Security Administration recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p (effective March 28, 2016). The new ruling supersedes SSR 96-7p and

eliminates the term "credibility" to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p. On remand, the ALJ should re-evaluate Plaintiff's subjective symptoms pursuant to SSR 16-3p.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 14] is granted, and the Commissioner's motion for summary judgment is denied [dkt 19]. The case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgment is entered in favor of the Plaintiff and against the Commissioner.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: May 18, 2016